# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br><div align="center">**Plaintiff,**</div><br>   v.<br><br>**EDWARD CONSTANTIN, a/k/a "MrZackMorris," a/k/a "Edward Constantinescu,"<br>PERRY MATLOCK, a/k/a "PJ Matlock,"<br>THOMAS COOPERMAN, a/k/a "Tommy Coops,"<br>GARY DEEL, a/k/a "Mystic Mac,"<br>MITCHELL HENNESSEY, a/k/a "Hugh Henne,"<br>STEFAN HRVATIN, a/k/a "LadeBackk,"<br>DANIEL KNIGHT, a/k/a "Deity of Dips," and<br>JOHN RYBARCYZK, a/k/a "Ultra Calls," a/k/a "The Stock Sniper,"**<br><br><div align="center">**Defendants.**</div> | **Civil Action No. 22-CV-____ (___)**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against the defendants:

## SUMMARY

1.     To their legions of followers on social media, the eight defendants have, for years, promoted themselves as trustworthy stock-picking gurus. In reality, they are seasoned stock manipulators. They identify stocks ripe for manipulation, acquire substantial positions in these securities, and then recommend those stocks as good investments to their followers on Twitter, in online stock-trading forums they run, and on podcasts. They encourage their followers to purchase the selected stocks, often claiming that they likewise have bought or intend to buy these

stocks for themselves and hold them.  Instead, the defendants sell their shares into the demand that their deceptive promotions generate.

2.      Seven of the defendants—Perry Matlock, Edward Constantin, Thomas Cooperman, Gary Deel, Mitchell Hennessey, Stefan Hrvatin, and John Rybarcyzk—carried out the scheme, coordinating the acquisition of shares, promoting the shares to their followers, and dumping the shares for substantial profits.  They were aided and abetted by Daniel Knight, who with Hennessey, co-hosted a popular stock-trading podcast that promoted the other defendants as expert traders and provided a platform for other defendants to deceptively promote the stocks they intended to dump.

3.      From at least January 2020 through present (the "Relevant Period"), the eight Defendants earned approximately $100 million from this stock-manipulation scheme.

## VIOLATIONS

4.      As a result of the conduct alleged herein, defendants Constantin, Matlock, Cooperman, Deel, Hennessey, Hrvatin, and Rybarcyzk violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)], and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5(a), (b) & (c)].   Knight aided and abetted, and unless restrained and enjoined, will continue to aid and abet these violations of the Securities Act and the Exchange Act.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

5.      The Commission seeks a permanent injunction against the Defendants, enjoining them from engaging in transactions, acts, practices, and courses of business of the type alleged in this Complaint; disgorgement of all ill-gotten gains from the unlawful conduct set forth in this

Complaint, together with prejudgment interest; civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; and such other relief as the Court may deem appropriate.  The Commission further seeks an order barring Hrvatin from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or 21(d) of the Exchange Act [15 U.S.C. §78u(d)].

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), and 78aa].

7.      Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].  Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the Southern District of Texas, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails.  Four Defendants reside in the Southern District of Texas, where they communicated with co-defendants in furtherance of the fraud scheme and made numerous false and deceptive statements as described herein.

## DEFENDANTS

8.      **Edward Constantin**, a/k/a "MrZackMorris," a/k/a "Edward Constantinescu," 38, is a resident of Houston, Texas.  His Twitter account, @MrZackMorris, had more than 551,000 followers as of December 2022.  Constantin is a co-founder of Atlas Trading, a stock-trading forum on the social media platform Discord, which offers users the ability to communicate via

voice calls, video calls, and text messaging, among other things.

9.      **Perry Matlock**, a/k/a "PJ Matlock," age 38, is a resident of The Woodlands, Texas.  His Twitter account, @PJ_Matlock, had more than 340,000 followers as of December 2022.  Matlock refers to himself as the "CEO" and co-founder of Atlas Trading.

10.      **Thomas Cooperman**, a/k/a "Tommy Coops," 34, is a resident of Beverly Hills, California.  His Twitter account, @ohheytommy, had more than 129,000 followers as of December 2022.  Cooperman is a member of the electronic music group Breathe Carolina and, with Gary Deel, runs a YouTube channel called the "Goblin Gang," described as "[t]wo multi-millionaire day traders filming their lives for the internet to see."

11.      **Gary Deel**, a/k/a "Mystic Mac," 28, is a resident of Beverly Hills, California.  His Twitter account, @notoriousalerts, had approximately 144,000 followers as of December 2022.  With Cooperman, Deel runs the Goblin Gang YouTube channel.

12.      **Mitchell Hennessey**, a/k/a "Hugh Henne," 24, is a resident of West New York, New Jersey.  Along with Daniel Knight, Hennessey hosts the "Pennies: Going in Raw" podcast, which promotes Atlas Trading.  His Twitter account, @Hugh_Henne, had more than 237,000 followers as of December 2022.

13.      **Stefan Hrvatin**, a/k/a "LadeBackk," 35, is a resident of Miami, Florida.  His Twitter account, @LadeBackk, had more than 150,000 followers as of December 2022.

14.      **Daniel Knight**, a/k/a "Deity of Dips," 28, is a resident of Houston, Texas.  With Hennessey, Knight is a co-host of the Pennies: Going in Raw podcast.  His Twitter account, @DipDeity, had more than 171,000 followers as of December 2022.

15.      **John Rybarcyzk**, a/k/a "Ultra Calls," a/k/a "The Stock Sniper," 32, is a resident of Spring, Texas.  His Twitter account, @Ultra_Calls, had more than 267,000 followers as of

December 2022.  Rybarcyzk is the founder of Sapphire Trading, another stock trading forum on Discord.

16.     Defendants Constantin, Matlock, Cooperman, Deel, Hennessey, Hrvatin, and Rybarcyzk are referred to herein as the "Primary Defendants."  With the addition of Knight, the collective group of all defendants is referred to herein as the "Defendants."

<div align="center">

**FACTS**

</div>

**I.     SUMMARY OF SCHEME**

17.     The Defendants engaged in a long-running fraudulent scheme to manipulate securities by publishing false and misleading information in online stock-trading forums, on podcasts, and through their Twitter accounts.  The Primary Defendants, aided and abetted by Knight, engaged in a pattern of conduct, sometimes referred to as "scalping," in which they recommended the purchase of a particular stock without disclosing their intent to sell that stock. They generally executed their scheme in three phases.  First, one or more of the Primary Defendants identified a security to manipulate (the "Selected Stock") and purchased shares of that particular security.  By sharing the name of the Selected Stock among some or all of the group, the Defendants provided each other with the opportunity to purchase shares at lower prices prior to the manipulation.  Next, they promoted the stock to their followers on podcasts and/or social media platforms in order to generate demand and inflate the share price.  Typically, the Primary Defendants announced price targets, teased upcoming news about the company, and/or stated their intention to buy shares or hold their current positions for longer periods. Finally, after promoting the stock to their followers in these ways, the Primary Defendants sold their shares into the demand generated by their recommendations.  When the scheme succeeded, the Primary Defendants were able to sell their shares at higher prices and make profits.  In order

to cover up their scheme and continue perpetrating it, the Primary Defendants at various points deleted old tweets and Discord chats, and lied to their followers about the reasons why particular stock picks were followed by declines in the prices of those stocks, obscuring their own roles in causing losses among their followers and other retail investors.

18.     None of the Primary Defendants disclosed that they were either planning to sell, or were actively selling, a Selected Stock while recommending that their followers buy it.  Nor did any of the Primary Defendants disclose that they were coordinating with each other to manipulate the price and volume of trading in the stocks they were promoting.   Moreover, the Primary Defendants' deception extended beyond their omissions and outright lies about their intentions regarding, and views about, the securities they were promoting.  For instance, sometimes they peddled false or misleading news about particular stocks through social media or podcast interviews.  On some occasions, the Primary Defendants lied about losing money on a particular stock when in reality they had profited handsomely, in order to generate trust among their followers—trust that was necessary to perpetuate the scheme and ensure that their followers would continue to purchase shares based on their future recommendations.  Indeed, in private chats and surreptitiously recorded conversations, they bragged and laughed about making profits at the expense of their followers.

19.     Defendants' specific roles in the fraudulent scheme varied depending on the timeframe and the specific security at issue.  Typically, only a subset of the Primary Defendants participated in the manipulation of a particular stock.  Those Primary Defendants would agree on a Selected Stock in which they would each establish a position (i.e., "load" or "load up" on the stock).  After loading up on the Selected Stock, most, if not all, of the Primary Defendants who had established positions in that stock would recommend it to their followers.  The Primary

Defendants often referred to "swinging" or taking a "swing" position in the stock, by which they conveyed to their followers that they intended to hold onto the stock for at least a day, and likely longer.  As the Primary Defendants involved in the deceptive promotion of a particular stock often informed other Defendants of their plans, those not directly promoting the stock could— and often did—take advantage of the advance knowledge by purchasing the Selected Security, in advance of the promotion, and selling the Selected Security at inflated prices that resulted from the promotion.  Over the course of the ongoing scheme, all of the Primary Defendants, aided and abetted by Knight, engaged in this conduct, participating directly in scalping and other deceptive conduct, and all of the Defendants profited from the knowledge that others were doing so.

20.     The Primary Defendants deceptively promoted stocks through three channels: stock-trading forums on Discord; podcasts; and Twitter.

21.     **Online stock-trading forums.**   In 2018, Defendants Matlock and Constantin founded Atlas Trading ("Atlas")—a free online forum that cultivated a following of novice stock traders by purporting to provide educational content about trading and securities markets.  Atlas describes itself as "a team of consistent profitable traders who are willing to educate beginning traders with free resources of education, free trading alerts and ideas."  Atlas is hosted on Discord, a social media platform that offers users the ability to communicate via voice, video, and text messaging, among other things.  Matlock and Constantin are among a small group of individuals who control the portion of the forum in which various Defendants recommended specific stocks (the "SMALL CAPS trading floor").  Sub-forums such as the SMALL CAPS trading floor are referred to as "channels" on Discord.  Although anyone could view the content on the SMALL CAPS trading floor channel, only individuals who are granted permission by the small group of members that include Matlock and Constantin are permitted to post content there.

As Matlock explained, "the … [SMALL CAPS] trading floor is locked . . . to most.  We kind of reserve this channel for people who know more about stocks and have better information that we've, you know, deemed worthy, I guess you could say, and they'll discuss tickers in here . . . during market hours, it's more about calls and what's going on with the market."  At various times from 2018 to the present, Matlock and Constantin, along with Rybarcyzk, Deel, Hennessey, Cooperman, and Knight, were allowed to post stock recommendations on the Atlas SMALL CAPS trading floor.   By early 2021, Atlas had more than 150,000 members.

22.     In 2018, Rybarcyzk founded Sapphire Trading ("Sapphire"), another stock-trading forum on Discord.  Sapphire featured a channel called the "pro-trader floor" that was analogous to Atlas's SMALL CAPS trading floor.  In addition to Rybarcyzk, Defendants Deel and Cooperman were permitted to post on Sapphire's pro-trader floor.  By mid-2021, Sapphire had nearly 60,000 members.

23.     **Podcasts.**  In July 2020, Knight and Hennessey launched a podcast called "Pennies: Going in Raw" ("PGIR").  PGIR bills itself as an informational podcast "[d]iscussing volume, price targets, penny stocks, accumulation, reverse splits and much more" and claims to be the "#1 Stock Market Podcast in America" with over 2.3 million downloads.   PGIR served as a platform to promote Atlas and the Defendants, most of whom sat for multiple interviews with Knight and Hennessey.

24.     **Twitter.**  Each of the Defendants amassed substantial numbers of followers on Twitter, where they regularly post about stocks they are manipulating.  The term "FinTwit" refers to the community of Twitter users that regularly tweet about finance and the stock market.  Defendants considered themselves influential within the FinTwit community.  As Hennessey remarked in a private Discord chat, "20 of us run fintwit an [sic] we have more money then [sic]

some countries." The Defendants each included disclaimers on their Twitter accounts that they were not providing stock recommendations or financial advice. But they intended for their followers to act on their promotional tweets, and understood that their followers would do so. Constantin, for example, acknowledged in an interview with Knight and Hennessey on PGIR: "I understand that if I call something, you know, everybody and their mom is going to buy." That expectation is reflected in hundreds of tweets by the Defendants, including in the examples below during the Relevant Period:

    a. Rybarcyzk ("The Stock Sniper" / @Ultra_Calls): *If you didn't bank with the gang today; then idk what's wrong. Gave this alert on Twitter and Sapphire Trading Discord (1000% FREE)*

    b. Cooperman ("Tommy Coops" / @ohheytommy): *Hope everyone banked on this one. Did exactly what I said . Support entries and then NHOD [New High of the Day]. Didn't wanna just keep talking about it <3*

    c. Deel ("Mystic Mac" / @notoriousalerts): *Alright Goblins I'm out for the day. EVERYONE should have banked with me on the initial $EXPR call at 5.15 or on the dip entry a second ago. Love you guys I'll see you all tomorrow to make stupid money with you again!*

    d. Matlock (@PJ_Matlock): *I'll never get sick of pumping.... money into my followers bank accounts. LETS ALL GET RICH!*

    e. Hennessey (@Hugh_Henne): *Every single member of atlas admin Have the same goal... to get as many people away from the 9-5 slavery and into the area of financial freedom and f u money. ❤our gains but seeing stories of others paying off debt& banking is much more rewarding @MrZackMorris @PJ_Matlock*

    f. Knight ("Dan, Deity of Dips" / @DipDeity): *Congrats to all the longs that banked with me on this one. I know I called it right as the market opened, but if you caught this one - you should be thanking me now*

    g. Hrvatin (@LadeBackk,): *Next week I'm gonna have a nice one for us. Promise. I might even say something along the lines of... "Get in p*ssy, we're going to the moon."*

25.     Defendants regularly promoted their own stock-trading success, and the substantial wealth it brought them, along with the success of individuals who followed their advice, in order to further their scheme and encourage their followers on social media to act on their recommendations.  For example:[1]

**Hennessey:**

a.  On June 15, 2020, Hennessey tweeted:  *"6/15/2020: Decent day for the swings. Had to deal with something personal early this morning.. but working on a few new winners  Had a blast w my boy @notoriousalerts An hour of bro's, analogies and lessons! $1 MILLION in UNDER a YEAR Trading Stocks!!!"*

b.  On December 19, 2020, Hennessey tweeted:  *"ATLAS has the most self made millionaires We do not even know the names of the people that consider us their "competition" We are the '85 Bears. No one survives."*

c.  On December 25, 2020, Hennessey tweeted:  *"Merry Christmas. Steps to financial freedom 1). Compound gains*

    *@MrZackMorris [Constantin] $800 to what 15...20 mil in 3 years*

    *@PJ_Matlock [Matlock] few k to MILLIONS*

    *@notoriousalerts [Deel] $1,000 to 500ish k in 15 months*

    *@DipDeity [Knight] $4,000 to 6 figures in a year*

    *WE DID IT SO CAN YOU..."*

**Cooperman:**

d.  On April 4, 2021, Cooperman tweeted:  *"Get some sleep tonight gang. Tomorrow we continue the journey to you becoming a f*cking millionaire. BRING YOUR F*CKING SHOES!"*

**Hrvatin:**

---

[1] Throughout the Complaint, expletives have been redacted in part with asterisks from the original text.  Tweets and Atlas posts are generally italicized but otherwise unchanged, with spelling/grammatical errors preserved.

e.   On October 20, 2021, Hrvatin tweeted:  *"$4000 a day makes you a millionaire."*

## Matlock:

f.   On July 15, 2022, Matlock tweeted:



## Constantin:

g.   On December 30, 2021, Constantin tweeted:



Constantin is depicted in front of the Ferrari in the picture at left; Constantin, Knight and a third individual (redacted in part) are depicted in front of the Ferrari in the picture at right.

**Rybarcyzk:**

*h.* On November 22, 2021, Rybarcyzk tweeted: *"I don't want clout. I want my every single one of my followers to be millionaires."*

*i.* On December 29, 2021, Rybarcyzk tweeted: *"I'm trying to hit 777 millionaire traders 2022. I'm gonna make it happen. It's not my goal to only make me prosper. I want all of you to prosper. I'm gonna make each and every one of you make it. The market is so universal. You just adapt to current conditions. Let's go crazy."*

j. On July 26, 2021, Rybarcyzk tweeted:



**Deel:**

k.  On July 16, 2021, Deel tweeted:  *"Actually 500 into 7Million, but who's counting."*

l.  October 29, 2021, Deel tweeted:  "Bout 5K short of a million dollar month. Truly UN F*CKING REAL!!!! We will nail in on November I promise you that!!!! LETS GO!"

26.     Tweets like those identified above served to further the scheme by convincing followers that acting on the Primary Defendants' recommendations would likely lead to significant wealth, and by falsely portraying their trading methods as accessible to anyone willing to learn.

27.     As described above, defendants repeatedly sold shares in direct contradiction to their public statements to followers on social media that they were continuing to buy, and or holding their positions, in anticipation of higher share prices.  This practice is called "dumping," and despite repeatedly dumping their stock as they recommended it to their followers, the Primary Defendants reassured their followers and the general public that they did not engage in such behavior, as illustrated by the false and misleading statements and posts below from the Relevant Period:

a.  Constantin (Twitter):  *I don't dump on people.*

b.  Constantin (PGIR Interview):  I'm not going to like continue calling something just so, you know, we can get out.  We take our losses, whatever, you move on.

c.  Matlock (Twitter):  *And I'm not pumping and dumping on anyone. Why would I sell when I truly believe $RIBT gets over $1.50-$2.  Haters mad to see anyone winning and come out if the stock is down 3% . All I post is information about it.*

d.  Deel (Twitter): *$BCTX recap: I buy stocks that I think have a good chart and good news. That's how I always play it and sometimes it goes the wrong way. That's trading. I never dump shares on alerts. BCTX got smacked hard on a vwap reject and I took the L with you guys earlier. On to next*

    e.   Cooperman (Twitter): *so we are CRYSTAL F\*CKING CLEAR ... i dont dump on my followers. nor do i even have the following big enough to dump all my shares on. if i say i think something is going to do something THATS WHAT I THINK ITS GONNA DO.*

    f.   Rybarcyzk (Twitter): *You guys are my family. Whoever has my back is a real MVP. I've posted many negative P&L images. I don't dump on anyone. If I have to I'll just take my losses. I have diamond hands though.*

28.    These false and misleading statements furthered the Primary Defendants' scheme by building trust among their followers, so that the Primary Defendants could continue to deceptively promote stocks, and continue to profit by selling their shares into the demand that their promotion generated, all without disclosing either their plans to sell, or their actual sales.

29.    The Defendants understood that they were participating in an unlawful market-manipulation scheme, and that they were profiting from misleading their followers.  The Defendants sometimes discussed their scheme over Discord voice chats that they believed were private, but were being recorded.  For example, on March 1, 2021, Knight and Cooperman (along with others) discussed the group's manipulation of the securities of GTT Communications, Inc., which at the time traded on the New York Stock Exchange ("NYSE") under the ticker GTT.[2]  The following is a portion of the conversation:

*Knight*:  Get caught? . . . We're robbing f\*cking idiots of their money. . .

*Cooperman*:  It's so funny because I can see the . . . . I can like see the timeline of these. Like I get it [the ticker], I send it to Dan [Knight].  I know Dan's on voice.  Dan tells you guys.  I see it go up more.  Then I send it to Gary [Deel] and I see it go up like way more [laughter] . . . .  My other thing is too, is like alright, if we lose on one of these, we've won on like a hundred so . . .  We gotta remember with these Ultra [Rybarcyzk] ones, they all do the same thing.  It like spikes, comes down for a second—

*Knight*:  Then the scalpers get out, like Gary [Deel] gets out, then—

---

[2] The NYSE delisted GTT on August 2, 2021.

*Cooperman*:  And then it goes f*cking bukoo, but no, that's not only it.  Like what he [Rybarcyzk] does is he alerts it, and then like five minutes later, all his little minions start like retweeting it and saying added with him, so it like builds the hype back up.  It happens every single time.  They have their shit down to a f*cking science, it's crazy.

Cooperman, Knight, and others were watching GTT's stock price and volume in real time during that conversation.  An unidentified individual exclaimed, "Wow, big dump!"  Cooperman then commented that he understood that at least one of the Primary Defendants, Rybarcyzk, was dumping at that moment.  He stated:  "I can like see them in my head coming out of the candle.  Like weee! [laughter]  Weee!"  Knight responded, "Another banger call guys," referring to the promotion.  Knight went on to make fun of Rybarcyzk's followers who were losing money as Rybarcyzk's share dump crashed the stock price:  "And all his [Rybarcyzk's] followers are like, 'Uh, yo we can't sell today, I don't have any day trades left.'"[3]  Knight's mocking of Rybarcyzk's followers elicited laughter.  The group continued to mock Rybarcyzk's followers.  Playing the role of one of Rybarcyzk's followers, Cooperman asked:  "Is this a swing?" eliciting laughter.  Knight continued, imitating Rybarcyzk's followers:  "Please be a swing."

30.     In another surreptitiously recorded Discord call, on February 24, 2021, involving Knight, Cooperman, and others, Knight acknowledged that he understood the Primary Defendants were engaging in market manipulation, and explained why he posted fewer recommendations on Twitter and Atlas than the Primary Defendants:

> "[The less] I mention a stock, the less likely I get involved whenever all of Atlas gets a class action f*cking lawsuit . . .  I'm playing this extremely smart, for the very long term.  If you don't think all these f*ckers go to jail or at least get sued, you are crazy. . . playing stupid does not work in court. . . it's market manipulation. . . . I mean you look up the definition of market manipulation . . ."

---

[3] The Financial Industry Regulatory Authority imposes certain restrictions on the number of "day trades" allowed in certain types of accounts below certain asset thresholds.

31.     Despite understanding that the Primary Defendants were engaging in market manipulation and profiting from misleading recommendations to their followers on Twitter, Atlas, and Sapphire, Knight continued to promote the Primary Defendants as expert traders on PGIR and provided them with a platform to peddle misleading statements about the stocks they were promoting.  Knight himself profited from the fraud scheme by taking positions in the stocks that he knew the Primary Defendants were manipulating, and selling into the demand the Primary Defendants generated through the fraud scheme.  Although Knight posted less frequently about the stocks, his role on the podcast was often to ask questions intended to elicit Hennessey or others to promote a stock.

32.     As noted, the Primary Defendants regularly trumpeted their trading successes to their followers.  They held themselves out as stock picking experts worthy of the substantial followings they had amassed.  But they also from time to time claimed they lost money on particular stock "plays."  Many of these claims of losses were false and designed to conceal the fact that the Primary Defendants had profited by dumping their shares into the demand their deceptive promotions had generated.

33.     For example, on August 11, 2021, Rybarcyzk claimed in a tweet that he lost money trading on ABVC Biopharma Inc. (NASDAQ: ABVC), which he had previously recommended to his followers:

> $ABVC Strange action today . Bag holder here 🤚 honestly doesn't make sense. Ran from $3.30 to $4.40's yesterday and to $4.20's today. But faded due to shorts and scalpers. I'm sure some made money. But I hold my word and don't dump on anyone.

Here, Rybarcyzk claimed that he lost money trading ABVC Biopharma (he was a "[b]ag holder"), and that others (including short sellers and "scalpers") caused the share price to drop, but that he did not make money because he does not "dump" shares on anyone.  But Rybarcyzk

actually made approximately $68,690 on August 10 and August 11, 2021 (the day he posted that

tweet) by dumping his shares while recommending ABVC to his followers.

34.     Similarly, on March 18, 2021, Deel, having promoted American Resources Corp.

(Ticker: AREC) to his followers, claimed he lost $20,000:

> Deel (@notoriousalerts):   *"$AREC stopped me guys. Sorry about this one I lost 20k here it looks like 1.5M shares were sold over 5. Sorry to anyone who took with me. Had great news this morning but didn't wanna go. I'll look for us a better one"*

In fact, Deel made more than $7,000 dumping his AREC shares on that day alone (and over

$6,000 selling his shares into demand generated by his posts the day before).

35.     Others Primary Defendants also deceived their followers about profits and losses

to further the scheme.  Matlock, for example, having promoted FDS Pharma, Inc. (NASDAQ:

HUGE) to followers, reported on Atlas on February 3, 2021:  "HUGE I took the loss on it too.

We will find a better one."  Matlock in fact made approximately $27,734 dumping his HUGE

shares the day he made that post.

## II.     Examples of Manipulation

### A.     Camber Energy, Inc.

36.      Several Primary Defendants manipulated the stock of Camber Energy, Inc. at

various times from August to October 2021.  Camber Energy trades on the New York Stock

Exchange under the ticker "CEI."  Deel, Matlock, and Cooperman established positions in CEI

stock and sold into their deceptive promotion in early August 2021; Constantin and Hvartin

established positions in the stock and sold into their deceptive promotion in September and

October 2021.  CEI was one of the Selected Stocks.

August 3-5, 2021:  Deel, Matlock, and Cooperman

37.     Matlock and Deel began purchasing shares of CEI on August 3, 2021.

17

Cooperman bought shares the next day.  By the afternoon of August 4, 2021, all three had

acquired significant positions in CEI, with Deel owning 936,422 shares acquired at an average

price of $.46 per share, Matlock owning 835,429 shares acquired at an average price of $.46 per

share, and Cooperman owning 405,000 shares acquired at an average price of $.47 per share.

Then, at 3:37 p.m. Deel posted the following message about CEI on Twitter and on Atlas:

> *$CEI I added for a swing. Volume is starting to come into pennies this week and this is very cheap. On the daily chart we have formed a double bottom. Last time it was at these prices we went to $3. So that leaves a lot of range.*

Matlock echoed the sentiment, posting on Atlas at 3:38 p.m.:  *"Adding CEI with you that's cheap*

*AF,"* using an abbreviation for the slang term cheap "as f\*ck."

38.     Within the next four minutes after those posts, Matlock sold 165,100 shares, Deel

sold 60,000 shares, and Cooperman sold 240,000 shares of CEI, as the price rose by a penny per

share.  At 3:43 p.m., Deel, Matlock, and Cooperman posted about CEI again:

- Deel (Twitter):  *"$CEI with the CEO saying no reverse split they have to think it will get to a dollar. I feel good with swinging this one this week for a run up."*

- Matlock (Atlas):  *"oh no r/s [reverse split] on CEI"*

- Cooperman (Twitter):  *"adding CEI here for a swing last time it touched these levels on the daily we saw a move to 3+  lots of DD on @notoriousalerts"*

39.     Immediately after these posts, Deel, Matlock, and Cooperman began selling more

shares.  Within two minutes, Deel had sold 95,000 shares, Matlock had sold 198,303 shares, and

Cooperman had sold all 165,000 of his remaining shares.  Each defendant sold for an average

price of $.48 per share.  All three continued to promote CEI on Twitter following their sales, and

Deel and Matlock continued selling, as described below.

- 3:46 p.m.: Deel (Twitter): *$CEI payyyyyyy us. Let's clear .50 next and trend up all after hours and tomorrow.*

- 3:47 p.m.: Deel (Twitter):



40.     While Deel was promoting CEI on Twitter, he was simultaneously selling his shares, liquidating 60,000 shares at an average price of $.48 per share.  During that same two-minute window, Matlock sold 228,781 shares at an average price of $.48 per share.  Matlock then immediately promoted CEI on Atlas, claiming "Also CEI is great for Biden infrastructure plan."

41.     As soon as Matlock promoted CEI on Atlas, he began selling again, and by 3:51 p.m. had liquidated another 70,600 shares at an average price of $.48 per share.  Deel also sold 41,000 shares at the same average per-share price during that two-minute window.

42.     Cooperman, despite not owning shares at that moment, continued to promote CEI while Matlock and Deel were selling.  At 3:51 p.m. Cooperman tweeted:  "*big bigger $CEI 👀👀👀*."  Over the next three minutes, Deel and Matlock sold, respectively, approximately 80,000 and 158,327 shares at an average price of $.49 per share.

19

43.     Deel then tweeted at 3:54 p.m., "*$CEI let's squeeze* 😎," suggesting that investors

bid up the price of CEI in order to force short sellers to exit their positions ("squeeze" the short

sellers) to avoid further losses.  As he had several times already that day, Deel continued to sell

CEI shares immediately after his tweet recommending that others buy CEI shares.  By 3:55 p.m.,

Deel sold 115,000 shares and Matlock sold all of his remaining 14,318 shares, at an average

price of $.49 per share.  A minute later, at 3:56 p.m., Matlock posted on Atlas: "*nhod CEI*"

referring to a "new high of the day."  Starting around the same time, Deel sold 165,000 shares at

an average price of $.494 per share over the next three minutes.  Between 3:58 p.m. and 3:59

p.m., Matlock bought 48,555 shares at an average price of $.487 per share and sold 48,555 at an

average price of $.493 per share, leaving him with none.  .

44.     At 4:00 p.m., Deel tweeted:  "*$CEI .50 now!!! How high we going*"?  He

immediately sold 9,610 shares at $.50 per share.  A few minutes later, at 4:06 p.m., Deel tweeted:

*$CEI holding and adding more in AH. Tomorrow we should run most of day."*  Despite telling

his followers he was holding his CEI shares and intended to add to his position in after hours

("AH" trading), Deel immediately began selling.  Over the next five minutes, Deel sold another

5,390 shares at $.50 per share.

45.     Conforming to his typical pattern, Deel continued to suggest that his followers

hold their shares and await increases in price, while he was dumping his shares into the market:

- 4:13 p.m.: Deel (Twitter): *yes it can AC that's what I am waiting on $CEI we nailed those low entries down there and now everyone is safely in the profit zone and we ride https://t.co/0AqkvUYl3N*

- 4:15 p.m.: Deel (Atlas): *CEI we look really good here. We got dead bottom on original alert in here and now we should all be in the profit and see how far we run up. I am holding full into tomorrow*

From 4:17 to 4:20 p.m., Deel sold another 6,000 CEI shares at $.50 per share.

46.     At 4:23 p.m., with the CEI share price around $.49 per share, Deel tweeted,

*"Nice!! Thanks for sharing it would be great if they give us a PR on Friday 👀 $CEI. Either way, I think this stock will eventually get back to $1 the chart has room to $3 but I'll will gracefully make my exit around $1."*

47.     At 5:00 p.m., after telling his followers he was holding his shares until the CEI share price reached $1, Deel sold 3,000 shares for approximately $.50 per share.

48.     The next day, August 5, 2021, Matlock and Cooperman reestablished positions in CEI, and Deel increased his position in CEI, before once again posting buy-and-hold recommendations while they sold their shares.  That morning, Deel bought 212,400 CEI shares and Cooperman bought 190,000 shares, each at an average price of $.48 per share.

49.     Immediately after buying his CEI shares, Deel began promoting the company on Twitter.  At 9:55 a.m., Deel tweeted:  *"$CEI still in full and added more this morning. This is a swing and I'm here until I get the move I want. We already tested that .50 level yesterday I think another break of that sends us."*  A minute later, Matlock bought 130,000 CEI shares at an average price of $.48 per share.

50.     At 9:56 a.m., Deel posted to Atlas:  *"I added more to my CEI swing this morning."*  Over the next two minutes, Matlock and Cooperman sold 32,500 and 30,000 CEI shares, respectively, for an average price of $.48 per share.

51.     At 9:58 a.m., Cooperman sold 30,000 CEI shares; tweeted that he *"added some more CEI to the swing"*; and immediately sold all of his remaining 130,000 shares at an average price of $.48 per share.  Matlock also liquidated his CEI position, selling 97,499 shares (leaving him with 1 share) over the next few minutes at an average price of $.48 per share.  Deel also sold 64 shares at $.50 per share.

52.     Deel continued to post positive assessments of CEI on Twitter and Atlas throughout the morning, while selling his shares.  Between 10:35 and 11:09 a.m., Deel bought an additional 45,000 CEI shares at \$.49 per share and then tweeted:

> *Don't panic on \$CEI and tag me every 20 minutes. It's a*
> *swing. I'm adding all day. I alerted this yesterday at .46 and*
> *we are holding nicely right under .50 currently. I think we get*
> *a close over .50 by end of day and start the climb higher.*
> *There was hint of a PR [press release] tomorrow too*

Despite telling his followers he would be "adding all day" to a "swing," Deel soon began selling his entire position.  By noon, he had sold all 508,822 of his shares for about \$.51 per share.  He continued to promote CEI as he sold, posting on Atlas *"CEI looks so good it will pay us"* as he was dumping his shares.

53.     Between August 3, 2021 and August 5, 2021, the three defendants made approximately \$54,989 through their misleading tweets and posts about CEI; specifically, Deel made \$37,566; Matlock made \$12,729, and Cooperman made \$4,694.  This was a small taste of the profits to come from the longer-term manipulation that followed soon after.

September 1 – October 5, 2021: Constantin and Hrvatin

54.     On September 1, 2021, between 1:42 and 1:47 p.m., Constantin bought 2,000,000 shares of CEI at prices between \$.49 and \$.51.  Constantin then began posting price targets and memes about CEI in an effort to boost the stock's price and trading volume.  During the same period, Hrvatin purchased CEI shares, posted price targets, and then sold his entire position on multiple occasions.  What follows are representative examples of Constantin's and Hrvatin's purchases, posts, and sales.

55.     On September 1, 2021, at 1:58 p.m., Constantin tweeted:  "*\$CEI average .51 swinging with @LadeBackk [Hrvatin] for \$2+. Don't give us crap if it hits \$1 and you don't sell.*

*Your body, your choice. I like this stock.*"  The next morning, at 9:30 a.m., Hrvatin bought

100,000 CEI shares for $.69 per share, while announcing a $1 price target for CEI on Twitter:

"*$CEI let the $1 run begin.*"  Two minutes after that tweet, Hrvatin dumped all of his shares for

$.72 per share.

56.     On September 3, 2021, Constantin tweeted:  "*My homie @LadeBackk [Hrvatin]*

*holding with me. $3-5*."  On September 13, 2021, Constantin tweeted a price target of $3 to $5

for CEI and encouraged his followers to hold onto the stock: "*$CEI $3-5+.  Too many of you act*

*like little bitches when there's dips. It's all part of the game.*"

57.     On September 15, 2021, Hrvatin bought 100,000 CEI shares at $1.65 per share.

At 3:31 p.m., two minutes after he bought the shares, he tweeted:  "*$CEI I'm holding overnight.*

*A huge day is coming. I can feel it.*"  Within minutes, Constantin responded to Hrvatin's tweet:

"*I ain't selling under 3 beleed that.*"  Meanwhile, Hrvatin—despite telling his followers he was

"holding overnight" because "a huge day is coming"—had already begun to dump all 100,000 of

his shares for $1.66 per share between 3:34 and 3:36 p.m.

58.     On September 23, 2021, Constantin tweeted price targets of $3 and $5 dollars to

maintain interest in CEI among his followers.  Similarly on September 28, 2021, he tweeted:

"$CEI We consolidate at $3 and then we push to $5 then $10."

59.     The next day morning, September 29, 2021, Hrvatin bought 100,000 shares for an

average of $3.27 per share.  One minute after buying, at 10:30 a.m., Hrvatin tweeted:  "*$CEI get*

*ready for the next leg up. We're aiming for $4 today.*"  Five minutes later, Hrvatin sold all his

shares for $3.33 per share.  Later that day, Constantin continued to promote CEI, tweeting a price

target of $10 per share:  "*$CEI  shorts are screwed. See you at $10.*"

60.     On October 1, 2022, for example, Constantin told his followers he believed the

price of CEI shares would exceed $10 per share (*"$CEI will be another monster $10++"*) and that he would sell CEI shares at $10 to $20 per share (*"$CEI everything is going to be very ok. Z-DADDY selling $10-20"*).

61.     On October 5, 2021, Constantin reiterated on Twitter his $10 price target for CEI shares (*$CEI $10+*).  About a half hour later, he sold all 2,070,000 shares he owned, including the 2,000,000 shares that he purchased on September 1, 2021, for an average price of $2.61 per share.

62.     Between September 1, 2021 and October 5, 2021 Constantin made approximately $4,301,440, while Hrvatin made $249,761 buying and selling CEI stock.

**B.     Alzamend Neuro, Inc.**

63.     On or about June 15, 2021, Deel, Rybarcyzk, Hennessey, and Matlock identified Alzamend Neuro, Inc. (NASDAQ: ALZN) as one of the Selected Stocks in the scheme.  After an unsuccessful attempt to manipulate ALZN's securities on June 15, 2021, these defendants, joined by Cooperman and Knight (collectively, the "ALZN Participants"), regrouped and tried again between June 29, 2021 and June 30, 2021.  On June 29, 2021, Hennessey, Cooperman, and Knight all acquired shares of ALZN, while Deel also purchased ALZN shares before selling his entire position for a gain of $16,884 after posting:  *"ALZN I added for the swing. I think this one has a lot of upside in it and it goes with the theme. I think tomorrow this one is a lot higher."*  On the morning of June 30, 2021, Rybarcyzk and Matlock rejoined the group, purchasing 15,000 ALZN shares and 29,876 ALZN shares, respectively, while Deel reestablished a position in ALZN (84,000 shares) and Hennessey and Cooperman added to their positions.  Throughout the morning, several of these defendants posted about ALZN and sold at least a portion of their shares following their posts.

64.     For instance, at 10:11 a.m., Deel posted on Atlas:  *"ALZN great daily volume here. I think this one is setting up to breakout over 12 today. I mentioned my swing adds yesterday and I added more this morning."*  Following this post, between 10:12 and 10:14 a.m., Deel sold 39,800 shares of ALZN for an average price of $11.40 per share.  Then, at 10:17 a.m., Deel tweeted:  *"I think $ALZN is the next sick mover.  I have some added.  I think it breaks 12 today."*  Right after this post, between 10:18 and 10:19 a.m., Deel sold 39,000 ALZN shares for an average price of $11.73 per share.

65.     Then, at 10:19 a.m., Hennessey posted a "teaser" on Atlas from his and Knight's PGIR interview of ALZN's CEO that was set to air later that day.  Specifically, Hennessey quoted ALZN's CEO as saying there were "No plans to in the year raise any capital" and "We have enough Capital to put our drugs in human trials without needing to raise capital."

66.     Following the morning manipulation of ALZN, Deel and Rybarcyzk exchanged private messages about the stock on Discord, in which Deel shared that they were "loading" up on ALZN, and shared a direction from Hennessey to establish a large position before the promotion.  Specifically, they stated:

> Deel:  *we are loading these shares back down here on ALZN to send to nhod [new high of the day] after lunch if you want anymore*
>
> Rybarcyzk:  *Yes sir!*
>
> Deel:  *hugh* [Hennessey] *says get size*
>
> Deel:  *posting*

67.     Prior to this exchange, Hennessey had purchased 35,000 shares of ALZN. Following the exchange between Rybarcyzk and Deel, virtually simultaneously between 12:24 p.m. and 1:01 p.m., Rybarcyzk, Deel, Cooperman, and Matlock all "loaded up" on ALZN.

68.     Specifically, Deel purchased 48,000 shares, Rybarcyzk purchased 35,000 shares (for a total of 50,000 shares including 15,000 shares purchased earlier in the day), Cooperman purchased 10,209 shares, and Matlock purchased 24,000 shares.  The price of the shares purchased during that period was between $10.77 and $11.40 per share.  The ALZN Participants then engaged in a campaign to raise the price of the stock, falsely claiming that they were holding their shares, while selling them to realize profits.

69.     Specifically, immediately after the purchases were made, at approximately 1:02 p.m., Deel posted about ALZN on both Twitter and Atlas:  *"$ALZN is now my largest swing position open.  We broke 12 earlier, but that was a tease on what this will do.  I added these dips through lunch and now I will ride this for new highs and more.  I like the potential here and the market is hot for it."*  Deel's claim that he had a "swing" position was a representation that he would be holding the stock for at least a day or more rather than immediately selling.

70.     Minutes later and over the course of the next two hours, Rybarcyzk, Hennessey, and Cooperman joined Deel and began posting about ALZN.  Deel repeated his claim that he was "swinging" or that he had a "swing position."  Rybarcyzk specifically claimed that he was holding the stock "O/N" (overnight).  The messages also contained specific price targets of $12 per share, and talk of a "new high" approaching.  Deel also promoted the potential for growth from the company, claiming that *"the market [for ALZN's pharmaceutical products] is expected to exceed 10 Billion by 2025."*

71.     However, in contrast to their claims that they were holding their ALZN stocks and even adding to their positions, anticipating the stock price reaching $12 per share, Rybarcyzk, Hennessey, Cooperman, and Deel were, during the same two-hour period of time, selling all or most of their stock (i.e. "dumping" it) for less than $12 per share.  For instance, while at 1:02

p.m. Deel had claimed that $12 was a "tease" and that he would now "ride this for new highs and more," immediately thereafter he sold 5,000 shares for $11.57 per share.

72.    By the end of the approximately two-hour period, when Deel, Rybarcyzk, Hennessey, and Cooperman were actively promoting the stock and making the above claims, Rybarcyzk, Deel, and Cooperman had sold all of their shares.  Matlock and Hennessey also sold during this period, with Matlock making $6,473 to add to his morning manipulation profits of $25,519 and Hennessey making $7,682 from his ALZN sales that day.

**C.    Vislink Technologies Inc.**

73.    Vislink Technologies Inc. (NASDAQ: VISL) is another example of a stock that was manipulated multiple times by various Defendants.  VISL was a manipulation involving misleading posts from Hennessey about on topics including "due diligence" he conducted on the company, and an interview of the CEO on PGIR.  Much of this activity occurred in February (when most of the illicit profits were made) and March 2021.  Below is an example from March 2, 2021 involving Rybarcyzk, Deel, Cooperman, Matlock, and Knight (the "VISL Participants").

74.    On the morning of March 2, 2021, Deel bought 40,193 VISL shares (net) at an average price of $3.76 per share.  Hennessey bought 1,600 shares for $3.73 per share.  Almost immediately, Deel and Hennessey started promoting VISL on Atlas.

75.    At 11:02 a.m., Deel posted:  "VISL climbing up to vwap [volume weighted average price] here."   At the same time Deel posted this, Hennessey bought 48,400 VISL shares for $3.79 per share.  Hennessey then posted at 11:03 a.m.:  "VISL CEO will also be on espn radito today."  With the price climbing over the next two minutes, Deel quickly sold his entire position for $3.84 per share.

76.     Later that afternoon, at 2:15 p.m., Deel bought 20,000 VISL shares at $3.635 per share.  One minute later, Hennessey tweeted:  "*Never gave my updated $VISL thesis and breakdown video I did with CEO Mr.Miller  My bad*."  One minute after that tweet, Deel sold his entire VISL position again, this time for $3.64 per share.

77.     Within minutes, Knight, Deel, Rybarcyzk, Matlock, and Cooperman began buying VISL securities.  By 2:41 p.m., the VISL Participants had amassed positions in VISL in the following amounts and average prices:

- Knight:  21,270 shares (net) for $3.72 per share (along with 20 call options with a strike price of $5.00 that expired on March 19, 2021);

- Deel:  91,160 shares for $3.67 per share;

- Matlock:  68,432 shares (net) for $3.82 per share;

- Cooperman:  25,000 shares for $3.72 per share; and

- Rybarcyzk:  200,000 shares for $3.80 per share.

78.     Matlock began promoting VISL stock almost immediately on Atlas.  At 2:41 p.m., he noted the increased volume of VISL trading in the "last 30 minutes," without noting that he and four other defendants were buying shares during that time.  One minute later, Matlock posted:  "VISL ww [i.e., "worth watching"] here."  Around the same time as that post, Matlock sold 23,414 (net) shares for an average price of $3.90 per shares, and Knight sold 6,000 shares at $3.89 per share. Knight also purchased 5 VISL call options with a strike price of $5.00 and an expiration of March 19, 2021.

79.     At 2:43 p.m., Deel posted on Atlas that VISL's price might increase in after hours trading, and that he purchased shares ("*VISL might be the runner in AH* [Afterhours] *I grabbed some*").  Meanwhile on a private Discord voice call that was surreptitiously recorded, Knight joked about Deel's Atlas post:  "He always grabs them a little bit too late," eliciting laughter

from others on the call.  Knight immediately sold 1,450 shares for $3.90 per share, and Matlock

sold 45,018 shares for $3.89 per share.

80.     Knight then asked in his private Discord voice chat:  "Should I retweet Michael

Hunt 'VISL yawn.  Wake me up at $10?'"  Knight joked that Hunt "may be sleeping for a while

bro," indicating Knight did not believe the stock price would rise to $10 per share.  Knight

nonetheless retweeted the Michael Hunt tweet.  A few minutes later, again in his private Discord

voice chat, Knight said, "I think my tweet worked."  And later he said, "I think my tweet

definitely helped it out right there."  Knight immediately began selling shares, and, by 2:48 p.m.,

had sold 8,050 shares for an average price of $3.91 per share.

81.     At 2:49 p.m., Deel posted to Atlas that VISL's share price would exceed $4

("*VISL breaking 4*").  Deel, Cooperman, and Knight then immediately began selling VISL

shares.  The continued to sell over the next three minutes, in the amounts and at the prices below:

- Deel:  20,000 shares for an average price of $3.99 per share;

- Cooperman: 12,500 shares for $4.00 per share;

- Knight:  2,500 shares for $4.01 per share (and 10 VISL call options).

82.     At 2:52 p.m., Knight tweeted *"All hail $VISL the Piss Missile"* and quickly began

selling again.  By 3:05 p.m., Knight had sold 1,500 shares for $3.99 per share (and 15 call

options), and Deel had sold 25,000 shares for $4.04 per share.  At 2:55 p.m., on his private

Discord voice chat, Knight joked that he "sold those VISL piss missiles at the right time."

83.     Right after he sold 5,000 shares, at 3:05 p.m., Deel posted to Atlas that he

believed VISL's price would still climb that day:  "*yeah VISL to nhod* [new high of the day]

*soon.*"  Beginning at 3:06 p.m., in a seven-minute span, Deel, Knight and Rybarcyzk sold shares

in the amounts and at the prices below:

- Deel:  4,876 shares for $4.11 per share;

- Knight:  1,270 shares for $4.07 per share;

- Rybarcyzk:  50,000 shares for $4.04 per share.

84.     At 3:17 p.m., Knight bought 450 shares for $4.03 per share.  Two minutes later, Hennessey tweeted "$VISL star link?" with an embedded video clip of Hennessey's interview of VISL's CEO.  Knight immediately sold 350 shares for $4.06 per share.  Within minutes, Hennessey and Rybarcyzk were promoting VISL on Twitter again, with Hennessey embedding additional video of his interview with the VISL CEO and Rybarcyzk stating he expected the share price to jump in after-hours trading ("*I smell an AH GAPPER on $VISL")*.  Rybarcyzk also posted Hennessey's tweet regarding Hennessey's interview with the VISL CEO.

85.     Immediately following these tweets, Rybarcyzk, Hennessey, and Knight collectively dumped 156,050 shares in two minutes.  Specifically:

- Rybarcyzk sold 100,000 shares for $3.93 per share;

- Hennessey sold all 50,000 of his shares for $3.94 per share;

- Cooperman sold 6,000 shares for $3.94 per share;

- Knight sold 50 shares for $3.97 per share (after buying 100 shares for $3.95 per share).

86.     At 3:31 p.m., Deel posted on Atlas that he believed, based on trading activity over the last hour (and without mentioning the VISL Participants' role in the activity), that VISL shares would increase in value in after hours trading:  "*VISL has been active the last hour. I think this makes a move AH a close over 4 would be* ideal *for a move."* A minute later, Deel sold 15,000 shares for $3.96 per share.  Cooperman sold another 500 shares for the same per-share price.  By 3:40 p.m., Deel had liquidated his entire VISL position, selling 26,284 shares for $3.90 per share.  He then reloaded, buying another 75,000 shares over the next few minutes for $3.92 per share.

87.     While Deel was buying shares, Hennessey tweeted "*$VISL - anyone hear it ?*

*CEO confirmed a PR [press release] within 4 weeks (Now 3 weeks)*" again embedding a clip of

his interview with the VISL CEO.   At 4:01, Hennessey tweeted additional information about his

"thesis" for VISL:  "*$VISL - from investor deck  - adding to the thesis  The 4 mil contract adds*

*13% to annual Rev (this accounts for doing nothing else)*."  Two minutes later, he tweeted:

"*$VISL we know rev are increasing as they've added customers and contracts and now have NO*

*DEBT*."  At 4:10 p.m., Deel posted on Atlas that based on the "VISL tape" he was "bullish."

Within minutes, he had dumped 74,090 shares for $3.81 per share.

88.     This particular manipulation of VISL stock occurred from March 2 to March 3,

2021.  Over this two-day period, Rybarcyzk made $26,315 trading VISL securities; Deel made

$25,829; Hennessey made $7,407; Cooperman made $6,690; Knight made $5,386; and Matlock

made $5,140.

**D.     Torchlight Energy Resources**

89.      On or about February 9, 2021, Hennessey identified Torchlight Energy

Resources (NASDAQ: TRCH) as a Selected Stock.[4]  On February 10, 2021, Hennessey,

Matlock, Deel, and Knight ("the TRCH Participants") purchased shares in the following

amounts:  Hennessey (196,019), Matlock (383,421), Deel (210,000, net), and Knight (8,562,

net).  The price of the shares ranged from $1.68 to $1.95 per share.

90.     After purchasing the shares, the TRCH Participants engaged in a campaign to

raise the price of the stock, falsely claiming that they were holding their shares, while selling

them to realize profits.  Knight aided and abetted the TRCH Participants in furthering the

scheme, by, among other things, providing them with a platform, the PGIR podcast.

---

[4] The company became Meta Materials Inc. (Ticker: MMAT) following a merger.

91.     In the course of the scheme, various Defendants often highlighted an anticipated event that would purportedly raise the stock price (a "catalyst") and encouraged buying and holding the stock until the event, falsely claiming that they too were holding the stock waiting for the catalyst.  In the case of TRCH, the catalyst was a purported upcoming merger with another company, Metamaterial Inc.  Hennessey claimed that he had discovered that this merger was coming in the course of his due diligence ("dd") research on the company.  Hennessey repeatedly promoted false information about Meta itself (e.g., that it was worth "north of $4.8 billion") and promoted the purported benefits of the merger.  Hennessey also posted about other purported long-term benefits to TRCH stock holders, including a "dividend" that TRCH shareholders would purportedly receive after the merger.  Hennessey also claimed that Meta was potentially partnering with Tesla, and that Meta had products that had applications for fighting COVID-19 and thus a "10 billion dollar MARKET CAP POTENTIAL."

92.      Several times in the course of the month, after realizing profits from a sale of TRCH stock, various TRCH Participants then "reloaded" by purchasing and selling more shares, as the stock price continued to rise in part as a result of their promotional efforts.

93.     Specifically, in the first round of manipulation, on February 10, 2021, from 10:11 a.m. to 10:12 a.m., after the TRCH Participants had all finished purchasing their shares that morning, Hennessey, Matlock, and Deel posted about TRCH on Atlas.  Despite the fact that all of the TRCH Participants had already purchased their positions, the posts were designed to falsely make it appear that Matlock and Deel were acting on Hennessey's recommendation:

- Hennessey :  *im Long TRCH for merger*
- Matlock:  *merger?*
- Hennessey:  *$TRCH merger should be done soon enough @Trade ALERT*
              *yes*
              *they had to do an offering*
              *now that the offering is done full steam ahead for merger*

- Deel:  *added TRCH*
- Hennessey:  *merger will be done any day now*
- Matlock:  *added*

94.     At 10:11 a.m., Hennessey also posted about TRCH on Twitter, falsely describing it as a "swing" position and promoting the purported upcoming merger with Meta.

95.     Over approximately the next seven minutes Knight sold most of his position (6,056 of 8,562 shares) for $2.12 per share, and Deel sold his entire position for $2.13 per share. By 10:25 a.m., Matlock had sold his whole position for $2.25 per share.

96.     Similarly, on February 12, 2021, Hennessey, having previously sold his entire position in TRCH, "reloaded" by purchasing 75,000 shares at 11:30 a.m. at $2.32 per share.  At approximately 12:30 p.m., Hennessey and Knight appeared as guests on a podcast, where they promoted TRCH.  Hennessey then spent the afternoon promoting TRCH on Atlas and Twitter, advancing the Tesla rumor and the purported upcoming merger.  In the late afternoon, between approximately 4:40 and 4:47 p.m., Deel and Matlock bought TRCH shares for between $2.84 and $2.99 per share.  Immediately thereafter, Hennessey made a misleading post about a potential COVID-19 "angle" for Meta products.  Matlock and Deel began tweeting to amplify the message and suggest they were holding TRCH stock.  In reality, immediately after the posting, they began selling their positions.

97.     Specifically, between 4:40 and 4:43 p.m., Matlock bought 153,582 shares at prices ranging from $2.84 to $2.99 per share.  Between 4:44 and 4:47 p.m., Deel bought 35,000 shares at prices ranging from $2.93 to $2.99 per share.  Hennessey, Deel, and Matlock then immediately began promoting TRCH on Atlas and on Twitter:

- 4:47 p.m.: "Hennessey (Atlas):  *DD for COVID 19 ANGLE - presentation (feb 2021)*
              *Inside the very last slide Meta mentions a biosensor*

> *'This smartphone attached biosensor under development uses nanomaterial for molecular fingerprint detection in a range of applications (such as COVID19 and others)*
> *THIS GIVES A 10 billion dollar MARKET CAP POTENTIAL @Trade ALERT"*

- 4:48 p.m.: Deel (Atlas): "*I am adding for the hold on TRCH*"

- 4:48 p.m.: Matlock (Atlas, responding to Hennessey's post): "*adding*"

- 4:48 p.m.: Matlock (Atlas): "*more*"

- 4:48 p.m.: Matlock (Atlas): "*that's insane news*"

- 4:49 p.m.: Matlock (Twitter): *$TRCH I smacked 50k on this news. She's going to all time highs*

Matlock's tweet included a link to a 4:47 p.m. tweet from Hennessey that was similar to Hennessey's Atlas post, described above.

98.     Immediately after that tweet, Matlock sold 30,000 shares for $3.14 per share, and Deel sold all 35,000 of his TRCH shares for $3.19 per share and a total profit on the day of $7,750.

99.     One minute later, at 4:50 p.m., Matlock posted on Atlas a price target of at least $4 for TRCH, referencing Hennessey's "due diligence":

> *TRCH going to 4+ after hours on @Hugh Henne new found covid DD*
>
> *https://discord.com/channels/428232997737594901/458013311846449152/80990 3629027770378 @PJ Matlock ALERT*

At the same time Matlock was posting this to Atlas, he was selling 49,602 shares for $3.32 per share.

100.     At 4:51 p.m., Matlock posted on Atlas: "*THis is gonna f\*cking blast off.*"

Matlock then immediately began liquidating his position in TRCH, as described below:

- 4:51 p.m.:  Matlock sold 38,977 shares for $3.43 per share;
- 4:52 p.m.:  Matlock sold 29,298 shares for $3.56 per share;
- 4:53 p.m.:  Matlock sold 5,430 shares for $3.63 per share;
- 4:54 p.m.:  Matlock sold his remaining 176 shares for $3.48.

Matlock made a profit of $67,766 during these last minutes of the trading day; his total profit was $75,116 for the day.

101.    On Sunday, February 14, 2021, in furtherance of the scheme, Hennessey and Knight discussed TRCH on PGIR.  Hennessey reiterated numerous false statements that he had made in previous communications to encourage buying and holding TRCH stock, including: falsely claiming that Meta was worth $5 billion; describing the "catalyst" of a merger happening on March 12; and describing the purported special dividend for TRCH shareholders after a merger.

102.    In total, the TRCH Participants' profits on TRCH from February 10 through February 23, 2021 were $288,603 for Hennessey; $336,138 for Matlock; $148,131 for Deel; and $2,757 for Knight.

**E.    ABVC Biopharma Inc.**

103.     In addition to working together in coordination to manipulate particular stocks, at times certain Defendants carried out the scheme on their own, by moving quickly to buy, manipulate, and sell a stock in a short period of time, quickly realizing a significant profit.

104.    For example, on August 10, 2021, Rybarcyzk began purchasing shares of ABVC Biopharma Inc. (NASDAQ: ABVC), at various prices under $4 per share, ending the day with 282,099 shares.  The next morning, August 11, 2021, he bought more than 24,000 additional shares at prices between $3.72 and $3.75.  Starting at approximately 8:00 a.m. and continuing for the next hour and a half, Rybarcyzk began tweeting positive messages about ABCV, setting a

price target of $4 and increasing to $6, all while buying stock and adding to his position:

- At 8:00 a.m., he tweeted:  "NO sleep just waking up too lol $ABVC looking strong still!!$4/$4.50 breakouts next."

- At 9:30 a.m., he tweeted:  "$ABVC Long $6+++"

105.    Beginning at 9:30 a.m., Rybarcyzk began selling his shares, starting at $4.09 per share.  For the next three hours, he continued to promote ABVC and a $6 price target, all while selling his shares for between $4.04 and $3.40 (as the share price began dropping).  By 12:25 p.m., Rybarcyzk had sold all of his ABCV shares, for a total profit that day of $68,690.

### FIRST CLAIM FOR RELIEF
### FRAUD IN THE OFFER OR SALE OF SECURITIES
#### (Violations of Section 17(a) of the Securities Act)

106.    Paragraphs 1 through 105 above are re-alleged and incorporated by reference as if fully set forth herein.

107.    By reason of the conduct described above, defendants Constantin, Matlock, Cooperman, Deel, Hennessey, Hrvatin, and Rybarcyzk, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

108.    As a result, defendants Constantin, Matlock, Cooperman, Deel, Hennessey, Hrvatin, and Rybarcyzk violated Securities Act Sections 17(a)(1), (2), and (3) [15 U.S.C. §77q(a)(1), (2), and (3)] and will continue to violate those sections unless enjoined.

**SECOND CLAIM FOR RELIEF**
**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)**

109.   Paragraphs 1 through 105 above are re-alleged and incorporated by reference as if fully set forth herein.

110.   By reason of the conduct described above, defendants Constantin, Matlock, Cooperman, Deel, Hennessey, Hrvatin, and Rybarcyzk, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

111.   As a result, defendants Constantin, Matlock, Cooperman, Deel, Hennessey, Hrvatin, and Rybarcyzk violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rules 10b-5(a), (b), and (c) [17 C.F.R. §240.10b-5(a), (b), and (c)] thereunder.

**THIRD CLAIM FOR RELIEF**
**AIDING AND ABETTING VIOLATIONS OF**
**SECTION 17(a) OF THE SECURITIES ACT**

112.   Paragraphs 1 through 105 above are re-alleged and incorporated by reference as if fully set forth herein.

113.   By reason of the conduct described above, defendant Knight directly or indirectly, singly or in concert with others, aided and abetted defendants Constantin, Matlock, Cooperman,

Deel, Hennessey, Hrvatin, and Rybarcyzk in violating Securities Act Sections 17(a)(1), (2), and (3) [15 U.S.C. §77q(a)(1), (2), and (3)].

<div align="center">

**FOURTH CLAIM FOR RELIEF**
**AIDING AND ABETTING VIOLATIONS OF**
**SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 THEREUNDER**

</div>

114.    Paragraphs 1 through 105 above are re-alleged and incorporated by reference as if fully set forth herein.

115.    By  reason of the conduct described above, defendant Knight directly or indirectly, singly or in concert with others, aided and abetted defendants Constantin, Matlock, Cooperman, Deel, Hennessey, Hrvatin, and Rybarcyzk in violating Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rules 10b-5(a), (b), and (c) [17 C.F.R. §240.10b-5(a), (b), and (c)] thereunder.

<div align="center">

**PRAYER FOR RELIEF**

</div>

WHEREFORE, the Commission respectfully requests that this Court:

A.    Permanently restrain the Defendants, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5];

B.    Order the Defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint;

C.    Order the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

C.      Enter an order barring the defendant Hrvatin from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

D.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

E.      Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.


DATED this 13th day of December, 2022.


                          Respectfully submitted,


                          */s/ David J. D'Addio*
                          David J. D'Addio
                          Amy Harman Burkart
                          Andrew Palid
                          David Scheffler
                          Attorneys for the Plaintiff
                          SECURITIES AND EXCHANGE COMMISSION
                          Boston Regional Office
                          33 Arch Street, 24th Floor
                          Boston, MA 02110
                          617-573-4526 (David D'Addio)